# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| ROBERT B. FIER, | ) | Case No.: 2:06-cv-01162-RLH-LRL |
| | ) | |
| Plaintiff, | ) | **DECISION, FINDINGS OF FACTS,** |
| | ) | **and CONCLUSIONS OF LAW** |
| vs. | ) | |
| | ) | |
| UNUM LIFE INSURANCE COMPANY OF | ) | |
| AMERICA, a Maine corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| UNUM LIFE INSURANCE COMPANY OF | ) | |
| AMERICA, a Maine corporation, | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT B. FIER, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

This is an action for recovery of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The parties stipulated to submit trial briefs to the Court for findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, in lieu of an actual trial. (Dkt. #36, Stipulation and Order for ERISA Trial Briefing Schedule ¶¶ 3–5.) The Court has considered Plaintiff Robert B. Fier's Trial Brief (Dkt. #54), filed June 11, 2008; Defendant Unum Life Insurance Company of America's Answering Trial Brief (Dkt. #58), filed August 5, 2008; Fier's Reply Brief (#59), filed September 3, 2008; and Unum's Sur-Reply Trial Brief (Dkt. #60), filed October 1, 2008. Having considered the above briefs and the exhibits and evidence cited therein, the Court now renders its Decision, Findings of Fact, and Conclusions of Law, as follows:

**DECISION**

Robert B. Fier has not proven by a preponderance of the evidence that Unum Life Insurance Company of America unlawfully withheld disability benefits from him under either the Group Long-term Disability Insurance policy, number 363834 (the "LTD policy"), or the Group Life and Group Accidental Death & Dismemberment Insurance policy, number 362381 (the "AD&D policy"). Fier has also not proven that he is entitled to present or future benefits from Unum under either policy.

Unum Life Insurance Company of America has not proven as a matter of law under ERISA § 502(a)(3) or, alternatively, by a preponderance of the evidence, that it is entitled to reimbursement of any of the disability benefits it has paid to Fier.

Therefore, the parties have not proven their cases and the Court does not find in favor of either party.

**FINDINGS OF FACTS**

1.      Plaintiff Robert B. Fier began working at the Boyd Group on May 15, 1987. He began as a Senior Technician, monitoring, installing, and repairing slot machines, primarily at the Boyd Group's California Hotel in Las Vegas.

2.      In 1992, Fier was promoted to the position of Slot Machines Manager charged with the supervision of as many as 200 employees.  He alleges it was common for him to be on the job for 20 straight hours, usually spending 14 hours a day at the job, and frequently awakened during the night by an urgent call to which only he could respond. Emergencies sometimes arose at Boyd Group's holdings outside Nevada, requiring Fier to travel by plane to other locations and address the problem.

3.      Fier alleges he performed the following duties at the Boyd Group: acted as a liaison between slot manager and slot repair personnel; wrote software programs; planned, organized, directed, and controlled all slot repair activities; performed quality control checks and maintained records; designed charts to monitor and communicate project and cost status; supervised up to 20

slot technicians and trainees; designed and implemented training and educational reimbursement programs; and directed, installed, operated, and maintained the IGT Slot Data/Player Tracking System.

4.      On March 17, 1992, following his promotion to management, Fier signed enrollment material for insurance coverage offered to executives. As a result, Fier became covered by the LTD policy and the AD&D policy, both underwritten by Defendant Unum and established and maintained pursuant to ERISA.

5.      The LTD policy promises an insured a monthly disability benefit of 60% of his basic monthly earnings if he becomes occupationally disabled, subject to an elimination period (defined as "a period of consecutive days of disability for which no benefit is payable") of 180 days and a maximum benefit period expiring at age 65 (which, for Fier, will occur in 2020). (Dkt. #21, Administrative R. ("AR") UACL00308, 00311.)

6.      The AD&D policy promises insureds a principal benefit sum of $20,000 to $300,000 depending on the type of loss an employee might experience. (AR UACL00332.) For "Benefit Grade B" employees, the policy promises $200,000 for the loss of both feet, meaning dismemberment by severance at or above the ankle joint. (AR UACL00348.)

7.      On October 17, 1992, at age 37 and while in his hunting lodge in Utah, Fier was shot in the throat by a drunk person. The shot severed his spinal cord and rendered him quadriplegic. In a report Fier generated in 1997, he wrote that his injury prevents him from working because he has "[v]ery limited (spastic) use of upper arms only[;] [n]o feeling or use of body below 3–4 [inches] above nipple line bilaterally[.]" (AR UACL00684.)

8.      Fier received medical treatment for this tragic injury at hospitals in Utah and Colorado. In response to a form question that asked "How long was or will patient be continuously totally disabled?", treating neurologist Jason A. Smith, M.D., wrote "permanently." (AR UACL00682–83.) The neurologist summarized the injury as "gunshot wound to neck with

3

1   transection of spinal cord at C-6 level." (AR UACL00686–87.) Fier was released from the hospital

2   on February 26, 1993.

3   9.          Fier claims he was never given a copy of either the LTD or AD&D policy. He

4   alleges that "[n]o one at Boyd apparently understood [his] rights and the benefits available to him

5   under the policy coverages in question. The best thing to do was to ask Unum and that is precisely

6   what happened." (Pl.'s Trial Br. 4.) Fier alleges there is no written record of how much

7   information was provided to Unum concerning Fier's injury in February 1993. But in a letter dated

8   February 8, 1993, Eric L. Helsley, Los Angeles Office Manager at Unum, wrote a letter to Erin

9   Colleran, assumably a Boyd employee, which stated: "I understand that you have a disabled

10  employee which you would like to have return to work on a full time basis. If the employee falls

11  under the recurrent disability clause (below), and becomes disabled again, this person would be

12  covered for a recurrent disability." (AR UACL00216.) Helsley then reproduced five paragraphs

13  purportedly from policy number 361381 (which is not the policy number of either the LTD policy

14  or the AD&D policy) discussing "recurrent disability" and closed the letter with a statement

15  encouraging Colleran to contact him if she had additional questions or comments.

16  10.         At some time prior to March 31, 1993, Fier resumed employment at Boyd Group

17  and began reporting to Boyd's offices on a limited basis. (AR UACL00106 (2004 Denial Letter

18  from Unum).) Fier argues he assumed a new position and occupation at Boyd, and that he was not

19  able to resume the arduous duties he carried in his previous occupation as Slot Machines Manager.

20  Fier claims that he could no longer spend the long hours required of him previously; he could not

21  perform the physical tasks he performed previously; he could not attend the numerous meetings

22  incidental to his prior position; he was unable to supervise his former subordinates or train

23  personnel; and he was unable to travel. Upon his return to Boyd, Fier received the same salary he

24  received prior to his injury and was provided a secretary and an assistant. He claims he often

25  arrived to Boyd around 11:00 a.m. each day due to the length of time required for personal hygiene

26  and tasks he had to complete as a result of his paralysis. (Pl.'s Trial Br. 5.)

AO 72
(Rev. 8/82)

11.          Fier alleges that in 1997, and as a result of financial problems, Boyd took away Fier's assistant and secretary and created the position "slot machine analyst" for him. Boyd reduced Fier's salary by $20,000 per year and eliminated the possibility of earning bonuses. With Boyd's encouragement, Fier initiated a claim for disability benefits with Unum in or about March 1997. (Pl.'s Trial Br. 5–6.) Unum had not been paying Fier disability benefits prior to 1997.

12.          The Employer's Statement segment of the proof of loss documents submitted with Fier's claim verified that Fier was hired by Boyd on May 15, 1987, and became insured under a plan on March 17, 1992. (AR UACL00666.) The accompanying Attending Physician Statement recorded that Fier was disabled by quadriplegia secondary to a gun shot wound to the neck, and that Fier was confined to a medical rehabilitation facility for this condition from November 2, 1992 to February 26, 1993. (AR UACL00673.)

13.          A Unum memo dated April 28, 1997 summarized Fier's claim thus:

> CLAIM SYNOPSIS: Claimant is 41-year-old male slot manager totally disabled since 03/12/97 due to quadriplegia. Claimant was injured in a hunting accident approximately four years ago—he was shot in the neck. Claimant was able to return to work own occupation, but very significant modifications were made. Claimant is in electric wheelchair and has minimal use of a hand, enough to operate chair. Policyholder was no longer able to accommodate claimant in this occupation, but they value his experience—they offered him a computer consultant position which pays less.
> ....
>
> **NOTE: Even though claimant is working full-time and the definition of disability is partial, he is not working in his own occupation and he is losing more than 20 percent earnings. He is considered totally disabled own occupation and the EP is not affected. This issue was discussed in great length and detail with the claimant, policyholder, broker and manager in a conference call.**
> ....

(AR UACL00129.)[1]

14.          On April 28, 1997, Unum wrote directly to Fier and advised him that policy 292819 (the incorrect policy, as Unum later conceded) provided two years of occupational disability

---

[1]  Unum's actual memo includes many abbreviations and does not use capital letters at the beginning of sentences. Plaintiff's counsel apparently rendered the above version of Unum's memo, and Unum did not object. The Court therefore references Plaintiff's long version for clarity.

benefits. (AR UACL00653.) In June 1997, a lawyer representing Fier sent a letter to Unum inquiring about conversion coverage under the disability policy. The letter also informed Unum that the correct policy was number 363834. (AR UACL00639.)

15.　　　　On July 11, 1997, a Unum employee made another entry in Unum's file regarding Fier that stated, in relevant part, "because [condition] is presumptive, approved claim. . . . [T]here is a good chance he may work elsewhere for greater than 80% [basic monthly earnings]. [M]ay either exceed 80% earnings in the future, or could be a potential settlement." (AR UACL00126.)

16.　　　　Unum granted Fier's request for disability benefits and began making payments to him under policy 292819 in late September or early October, 1997, and ceased making payments on December 7, 2004. (*See* AR UACL00097, 00099, 00105.) In total, it appears Unum paid Fier $152,069.02. (*See* AR UACL00097, 00099 (spreadsheet by certified public accountant showing $152.069.02 as "total paid" amount).)

17.　　　　On or about September 1998, Fier notified Unum he was leaving Boyd for another job that would enable him to work from his computer at home 70% of the time. During this period, Fier began to be concerned about his benefits and, late that year, retained his present counsel.

18.　　　　Fier, through counsel, sought payment from Unum of benefits allegedly due to him from the time of his injury in 1992 (less the elimination period). After negotiation efforts failed, Fier filed his first lawsuit against Unum on July 9, 1999.

19.　　　　While that action was pending, Fier and Unum continued to negotiate. On March 16, 2004, Fier filed a motion to dismiss his own case, which this Court (Hon. Lloyd D. George) granted, noting "Plaintiff's Motion to Dismiss concedes that the administrative record is not sufficiently developed to permit Court review and that Plaintiff needs the opportunity to exhaust his administrative remedies pursuant to ERISA."

20.　　　　In a letter dated December 29, 2004, Tim Holt, a senior disability benefits specialist at Unum, informed Fier's counsel of Unum's conclusions that (1) Fier's claim had not been payable since 1998; (2) Unum actually overpaid Fier by $140,402.33 (by one of Unum's

AO 72
(Rev. 8/82)

1   calculations with certain assumptions) or $145,402.34 (by another); and (3) Fier must reimburse

2   Unum for the lower amount. In its letter, Unum also conceded that the applicable policy was

3   number 363834. In his letter, Holt did not discuss Fier's claims pursuant to the AD&D policy.

4   21.          Fier corresponded further with Unum, arguing against the result Unum reached.

5   Unum allegedly did not respond further to Fier, and Fier filed this action pursuant to 29 U.S.C. §

6   1132(a)(1)(B). Fier's opening trial brief requests the following relief: (1) a determination that he is

7   entitled to occupational disability benefits, beginning from April 17, 1993 and continuing through

8   the present, in the amount of 60% of his basic monthly pre-disability earnings, less amounts

9   previously paid (an amount Fier does not calculate in his trial briefs); (2) a determination that he is

10  entitled to an accidental death and dismemberment benefit in the amount of $200,000; and (3) a

11  determination that he is entitled to monthly disability benefits in the amount of $3250 for as long

12  as he qualifies to receive them. Fier also seeks payment of the above-described benefits Unum

13  allegedly failed to remit.

14  22.          Unum's answering trial brief requests judgment (1) declaring that Fier no longer

15  meets the definition of "disabled" under the LTD policy and that Unum has no continuing

16  obligations to him under that plan; (2) declaring that Fier has been overpaid, in the amount of

17  $140,402.33; and (3) directing Fier "to submit in correct form his claim for AD&D benefits, so

18  that they may be considered in accordance with the Boyd AD&D plan's conditions, terms and

19  limitations." (Answering Trial Br. 22.)

20  23.          On March 5, 2007, Unum filed a Counterclaim seeking reimbursement of

21  $140,402.33 of its alleged overpayment to Fier and "equitable relief, including, but not limited to,

22  restitution, imposition of a constructive trust, and equitable lien to enforce ERISA and the terms of

23  the policy." (Dkt. #15, Answer and Countercl. 10.) Unum and Fier agree that the applicable LTD

24  plan is policy number 363834. They also agree the applicable AD&D policy is number 362381.

25  24.          While it appears Unum began paying Fier disability benefits beginning in

26  September or October 1997, (*see* AR UACL00097–98; Answering Trial Br. 14,) Unum seeks

AO 72
(Rev. 8/82)

1  reimbursement for its alleged overpayment to him only from 1998 through 2004 (the time it ceased

2  making payments to him). (Answering Trial Br. 13 n.8.)

3  25.            Fier does not dispute that his pre-injury monthly earnings were $7,916.67.

4  Annualized, his total pre-injury earnings were $95,000. Eighty percent of this annual amount is

5  $76,000.

6  26.            The LTD policy contains definitions of terms relevant to Feir's eligibility for

7  benefits. "Basic monthly earnings" is defined as "the insured's monthly rate of earnings from the

8  employer in effect just prior to the date disability begins. It does not include commissions,

9  bonuses, overtime pay and other extra compensation." (AR UACL00309.)

10  27.           The LTD policy states, with limitations not applicable here, that those who qualify

11  for benefits under the policy will be paid 60% of basic monthly earnings. (AR UACL00308.) Sixty

12  percent of Fier's pre-disability monthly earnings is $4750.

13  28.           Under a heading titled "Termination of Disability Benefits," the LTD policy states:

14  
15  
16  

> Disability benefits will cease on the earliest of:
> 1. the date the insured is no longer disabled;
> 2. the date the insured dies;
> 3. the end of the maximum benefit period;
> 4. the date the insured's current earnings exceed 80% of his pre-disability earnings.

17  (AR UACL00319.) The plan defines "indexed pre-disability earnings" as "the insured's basic

18  monthly earnings in effect just prior to the date his disability began adjusted on the first

19  anniversary of benefits payments and each following anniversary. Each adjustment will be based

20  on the lesser of 10% or the current annual percentage increase in the Consumer Price Index." (AR

21  UACL00312.)

22                          **CONCLUSIONS OF LAW**

23                          I. STANDARD OF REVIEW

24  1.             A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed

25  under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

26  authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*

1   *& Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "The plan language is the starting point for

2   addressing the standard of review for denial of benefits under ERISA.... If discretionary authority

3   is conferred, the administrator's decision is reviewed under the abuse of discretion standard."

4   *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1068 (9th Cir. 1999).

5   "[F]or a plan to alter the standard of review from the default of de novo to the more lenient abuse

6   of discretion, the plan must unambiguously provide discretion to the administrator. The essential

7   first step of the analysis, then, is to examine whether the terms of the ERISA plan unambiguously

8   grant discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th

9   Cir. 2006) (en banc) (citation omitted). A plan administrator has discretionary authority when the

10  plan's terms plainly grant the administrator the rights to (1) make final benefits determinations and

11  (2) interpret plan terms. *Id.* at 963–64 (also collecting cases with language held to grant

12  discretionary authority to plan administrators).

13  2.          On the other hand, "ERISA plans are insufficient to confer discretionary authority

14  on the administrator when they do not grant any power to construe the terms of the plan." *Id.* at

15  964. In *Ingram v. Martin Marietta Long Term Disability Income Plan*, the plan at issue provided

16  that "[t]he carrier solely is responsible for providing the benefits under this Plan"; "[t]he carrier

17  will make all decisions on claims"; and "the review and payment or denial of claims and the

18  provision of full and fair review of claim denial pursuant to [ERISA] shall be vested in the

19  carrier." 244 F.3d 1109, 1112–13 (9th Cir. 2001) (cited and quoted in *Abatie*, 458 F.3d at 964)

20  (alterations in *Abatie*). "Because those provisions merely identified the plan administrator's tasks,

21  but bestowed no power to interpret the plan, [the Ninth Circuit] applied de novo review." *Abatie*,

22  458 F.3d at 964.

23  3.          Neither the LTD policy nor the AD&D policy unambiguously grant the plan

24  administrator discretion to interpret plan terms.

25  4.          "The Ninth Circuit holds that the [summary plan description, or SPD] is a plan

26  document and should be considered when interpreting an ERISA plan." *Gertjejansen v. Kemper*

AO 72
(Rev. 8/82)

1   *Ins. Companies, Inc.*, 274 Fed.Appx. 569, 571 n.1 (9th Cir. 2008) (citation omitted). However,

2   Fier alleges "[t]here is no SPD pertaining to the 1992 time frame," and Unum does not claim

3   otherwise. But Unum points to an SPD issued by Fier's employer Boyd, which states, in relevant

4   part:

5        If a claim is denied in whole or in part, you may request a review of the decision....

     ....

6        The Plan Administrator will make a determination of your eligibility for the

7        benefits and will send its decision to you in writing within a reasonable period of
time. The decision of the Plan Administrator will be final. If the denial of benefits

8        is confirmed you will be told the reasons for the decision.

9   (Answering Trial Br. Ex. 1, Boyd SPD, BOYD 000149.) Even if the Boyd SPD were in effect and

10  applicable here, it provides only that the plan administrator's decision will be "final," but does not

11  vest the administrator with authority to interpret plan terms. This language, like that at issue in

12  *Ingram*, fails to clearly bestow "power to interpret the plan[.]" *Abatie*, 458 F.3d at 964. "De novo

13  is the default standard of review[,]" *id.* at 963, and Unum has not shown any relevant plan

14  language that unambiguously provides interpretive discretion to the administrator. Unum also

15  quotes language from SPDs dated 1995 and 1998, which do appear to grant Unum discretionary

16  authority to interpret plan terms. Those SPDs, of course, were not operative at the time of Fier's

17  injury in 1992. However, Unum actually decided to terminate Fier's benefits in 2004, and the SPD

18  in effect in 2004 might appropriately be given weight as a plan document in determining the

19  appropriate standard of review. "The issue of which version of the SPD applies when determining

20  the standard of review of an administrator's denial of disability benefits" was one recently of first

21  impression in the Second Circuit, *Gibbs v. CIGNA Corp.*, 440 F.3d 571, 576 (2d Cir. 2006), and is

22  one of first impression in this Circuit as well.

23  5.       Following the reasoning of the Second Circuit, the Court concludes de novo review

24  is appropriate here because Fier's benefits under the plan likely vested at the time he became

25  disabled in 1992. *See Gibbs*, 440 F.3d at 576 ("absent explicit language to the contrary, a plan

26  document providing for disability benefits promises that these benefits vest with respect to an

1   employee no later than the time that the employee becomes disabled") (citation and internal

2   quotation marks omitted). As such, Fier is entitled to whatever substantive benefits existed under

3   the plan at that time of his disability, including the possibility of de novo review in the event his

4   claim for benefits would be denied. *See Gibbs*, 440 F.3d at 576–78. Because "de novo review

5   applies, no further preliminary analytical steps are required. The [C]ourt simply proceeds to

6   evaluate whether the plan administrator correctly or incorrectly denied benefits[.]" *Abatie*, 458

7   F.3d at 463.

8   II.  THE LONG TERM DISABILITY POLICY

9   6.          The parties do not dispute that Unum had no obligation to pay disability benefits

10  during the 180-day elimination period beginning October 17, 1992. (*See* AR UACL00311

11  (defining "elimination period" and stating period begins "on the first day of disability.")) Thus, the

12  first day after the end of the elimination period—April 15, 1993—was the first day Unum could

13  have been obligated to pay disability benefits. The Court now considers what, if any, disability

14  benefits Unum owed Fier under the policy beginning at or subsequent to that date.

15  7.          Unum argues that it did not owe Fier disability benefits beginning April 15, 1993,

16  because, under the fourth prong of the "Termination of Disability Benefits" provision of the LTD

17  policy, Fier's return to his pre-disability income disqualified him for benefits. Under a heading

18  titled "Disability," the LTD policy provides:

19           When the Company receives proof that an insured is disabled due to sickness or
         injury and requires the regular attendance of a physician, the Company will pay the
20         insured a monthly benefit after the end of the elimination period. The benefit will
         be paid for the period of disability if the insured gives to the Company proof of
21         continued:
         1. disability; and
22         2. regular attendance of a physician.

23  (AR UACL00316.)  A subsequent section of the LTD policy, titled "Termination of Disability

24  Benefits," states:

25           Disability benefits will cease on the earliest of:
         1. the date the insured is no longer disabled;
26         2. the date the insured dies;

AO 72
(Rev. 8/82)

3. the end of the maximum benefit period;
4. the date the insured's current earnings exceed 80% of his pre-disability earnings.
(AR UACL00319.) Unum argues that Fier's eligibility for benefits ceased once he returned to work in 1993 because at that time he resumed making an income that exceeded 80% of his indexed pre-disability earnings.

8.      Fier does not dispute that his pre-injury monthly earnings were $7,916.67. Annualized, his total pre-injury earnings were $95,000; 80% of this annual amount is $76,000. Unum argues that "[b]ecause Fier returned to work—back on his regular salary ... as of his Boyd payroll on March 31, 1993—before the end of the elimination period, he did not meet the elimination period and no benefits were payable to him." (Answering Trial Br. 14.) The Court agrees. Although it appears that Fier was disabled within the meaning of the policy, the policy expressly provides that disability benefits will "cease" as of "the date the insured's current earnings exceed 80% of his pre-disability earnings." The policy's term "cease" is inartful when applied to facts such as these because Unum could not "cease" paying benefits it had not already been paying. Nonetheless, the intent of the policy language is clear: insureds are ineligible for monthly benefits when any of the four specified conditions exist. This interpretation of the provision is supported by another provision of the policy that requires the monthly disability benefit to decrease as the disabled insured's income increases. (*See* AR UACL00317 (benefit formula under which monthly benefit decreases as income increases).) Under the terms of the policy, Fier could not qualify for disability benefits until he could show proof of disability *and* that his income was less than 80% of his pre-disability income. Fier's income did not decrease to less than 80% of his pre-disability income until his salary was reduced by $20,000 per year in 1997, when Fier filed a claim with Unum for long-term disability benefits under the policy.

9.      Unum approved Fier's request for benefits following the elimination period in 1997. The letter from Unum indicating that his request had been approved, dated July 11, 1997, states that the 180-day elimination period was from March 12, 1997 through September 7, 1997.

1   The letter also stated that the first benefits check would be for the amount of $2,997.35 and would

2   be for the period of disability from September 8, 1997 through October 7, 1997. (AR

3   UACL00226.) The letter also indicated that Unum intended to pay benefits to Fier pursuant to

4   policy number 292819 (which, as noted above, was later shown to be the incorrect policy). The

5   letter states the plan provided Fier with 50% of his basic monthly earnings. (*Id.*)

6       10.        Unum paid the disability benefits it promised, beginning in 1997, and continued

7   paying benefits through near the end of 2004, paying Fier a total of $152,069.02. (*See* AR

8   UACL00097, 00099.)

9       11.        Fier changed jobs in April 1998. (AR UACL00197.) He does not dispute that his

10   reported taxable income for 1998, as a marketing project manager, was $81,454.[2] (AR

11   UACL00360.) In 1999, his income was $86,525. (AR UACL00374.) In 2000, his income was

12   $132,038. (AR UACL00382.) In 2001, his income was $126,415. (AR UACL00409.) In 2002, his

13   income was $112,185. (AR UACL00443.) Because Fier's "current earnings" exceeded 80% of his

14   pre-disability income beginning in at least 1998, Unum was entitled to terminate Fier's benefits in

15   1998. According to Unum's calculations, made when considering the correct LTD policy, Unum

16   should have paid Fier $11,666.69 or $6,666.68 more during the 1997 to 1998 period during which

17   Fier qualified for benefits. (*See* AR UACL00097, 00099.) However, Unum more than made up the

18   difference from 1998 to 2004, and allegedly overpaid Fier by a total amount of either $140,402.33

19   (by one of Unum's calculations with certain assumptions) or $145,402.34 (by another).

20       12.        For the above reasons, the Court concludes that Fier was not entitled to disability

21   benefits under the LTD policy prior to 1997. Fier was entitled to benefits under the policy,

22   beginning in 1997, in which his current monthly earnings were less than 80% of his pre-disability

23   earnings. During that period, Fier should have received disability benefits in the amount of 60% of

24

25       [2]  Unum also alleges that Fier's 1996 W-2 shows total compensation in the amount of $105,587.97.
26   (Answering Trial Br. 13 n.8.) Unum states that "[e]ven though Fier's income then exceeded 80% of his pre-injury earnings, Unum seeks reimbursement for overpayment to him only from 1998 forward." (*Id.*)

1   his pre-disability earnings, subject to any applicable deductions set forth in the policy (none of

2   which none appear to apply). (*See* AR UACL000316–18.) However, because of its error in

3   computing Fier's benefits under the wrong policy, Unum apparently failed to pay Fier $11,666.69

4   or $6,666.68 to which Fier was entitled during the period he was eligible for benefits. In 1998,

5   Fier's current monthly earnings met or exceeded 80% of his pre-disability level, at which time his

6   disability benefits were to "cease" under the policy. Unum, however, continued paying Fier

7   benefits until it ceased doing so in late 2004. In light of the fact that Fier does not dispute that his

8   income met or exceeded 80% of his pre-disability earnings beginning in 1998 and continuing at

9   least through 2002, the Court finds that Unum overpaid Fier. However, because Unum cannot

10  recover its overpayment (as discussed more fully in Part IV. *infra*), the Court need not, and does

11  not, make a finding quantifying the amount.

12  13.        Section V of the TLD policy, titled "Termination Provisions," states, in applicable

13  part:

14      An employee will cease to be insured on the earliest of the following dates:
        ....
15      5. the date employment terminates. Cessation of active employment will be deemed
        termination of employment, except
16          a. the insurance will be continued for a disabled employee during:
                i. the elimination period; and
17              ii. while benefits are being paid.

18  (AR UACL00322.) Because Fier is no longer employed by Boyd or receiving benefits payments

19  from Unum, Fier is no longer insured under the LTD policy. Because he is not covered under the

20  policy, Fier is not entitled to further benefits under the policy. Unum therefore has no present or

21  future obligation to him under the policy. The Court therefore does not need to determine whether

22  Fier currently meets the definition of "disabled" under the policy, as Unum requests.

23                  III. THE ACCIDENTAL DEATH AND DISMEMBERMENT POLICY

24  14.        Fier also seeks benefits under the AD&D policy, number 362381, also underwritten

25  by Defendant Unum. The AD&D policy provides payment of a lump sum to victims of accidental

26  death or dismemberment. The policy divides insureds into "grades," which correlate with

1    particular lump sum benefit amounts. Fier states that he "believes and hereby submits that ...

2    [Unum] characterized [him] as Grade B, qualifying for a principal benefit sum of $200,000[.]"

3    (Pl.'s Trial Br. 3–4.) As specified in Part I, Policy Specifications, Benefit Grade B indeed

4    correlates with the amount of $200,000 under a column titled "Accidental Death and

5    Dismemberment Benefits (Full Amount)," (*see* AD&D Policy, AR UACL00332), although Fier

6    has not submitted any actual evidence to support his claim that he was classified as Benefit Grade

7    B. The policy states:

8         The benefit determined from the Schedule of Losses and Benefits below and Part I
          of the Policy Specifications will be paid after receiving proof that:
9         1. an employee sustained an accidental bodily injury which caused an insured loss;
          and
10        2. the event causing the accidental bodily injury occurred while the employee was
          insured under this policy.

11

12   (AR UACL00348.) The Schedule of Losses and Benefits then states that for the loss of both hands

13   or both feet, the benefit will be the full amount set forth in Part I of the Policy Specifications. (*See*

14   *id.*) The policy then states that "[f]or hands or feet, 'loss' means dismemberment by severance at

15   or above the wrist or ankle joint." (*Id.*) Fier alleges that, under the policy, his quadriplegia

16   constitutes the "severance" of both his legs and his hands, and that he therefore qualifies for the

17   benefit that correlates with his grade. The policy does not define "dismemberment" or

18   "severance."

19   15.        Unum does not address Fier's arguments under the AD&D policy. Instead, it argues

20   Fier failed to "follow the policy procedure by obtaining the claim form and submitting the required

21   information for review, within the terms and limitations of the policy." (Answering Trial Br. 19.)

22   16.        The Court need not consider whether Fier exhausted the administrative

23   requirements established in the AD&D policy and will not direct him to do so because the terms of

24   the policy do not cover the injury he sustained. While Fier, tragically, has almost entirely lost the

25   function of his hands and feet, he did not lose them in the manner the policy expressly

26   requires—through "dismemberment by severance at or above the wrist or ankle joint." The plain

AO 72
(Rev. 8/82)

1    meaning of "dismemberment" is "[t]he cutting off of a limb or body part," Black's Law Dictionary

2    537 (9th ed. 2009); the plain meaning of "severance" is "[t]he act of cutting off; the state of being

3    cut off," *id.* at 1498. For a hand or foot to be dismembered by severance at or above the wrist or

4    ankle joint, then, it must therefore be "cut off" at least partially. Although Fier's hands and feet

5    were apparently rendered almost completely dysfunctional, none of them were cut off to *any*

6    degree, as the policy requires. Fier therefore did not lose a hand or foot within the meaning of the

7    AD&D policy, and the Court must dismiss Fier's claim for benefits under it. The Court also

8    concludes Fier was not covered by any other provision of the AD&D policy, which covers only the

9    loss of life, sight of one or more eyes, and loss of one or more hands or feet. (*See* AR

10   UACL00348.)

IV. UNUM'S COUNTERCLAIM

12   17.        In its Counterclaim, Unum seeks, pursuant to § 502(a)(3) of ERISA, 29 U.S.C. §

13   1132(a)(3) (2006), reimbursement for its overpayment to Fier. (Dkt. #15, Answer and Countercl.

14   10 ¶ 13.) "A fiduciary may bring a civil action under § 502(a)(3) of ERISA '(A) to enjoin any act

15   or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain

16   other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of

17   this subchapter or the terms of the plan.'" *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361

18   (2006) (quoting 29 U.S.C. § 1132(a)(3)). The term "equitable relief" in § 502(a)(3) "must refer to

19   'those categories of relief that were *typically* available in equity[.]" *Great-West Life & Annuity Ins.*

20   *Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251

21   (1993)).

22   18.        Equitable relief under § 1132(a)(3) "includes restitution[.]" *Cement Masons Health*

23   *& Welfare Trust Fund for N. Cal. v. Stone*, 197 F.3d 1003, 1005–06 (9th Cir. 1999); *see also*

24   *Sereboff*, 547 U.S. at 361; *Mertens*, 508 U.S. at 255 (construing ERISA § 502(a)(3) and stating

25   remedies traditionally viewed as "equitable" include "injunction or restitution"); *Trustmark Life*

26   *Ins. Co. v. Univ. Chicago Hosps.*, 207 F.3d 876, 880 (7th Cir. 2000) (stating within discussion of

ERISA § 502(a)(3) that restitution is "undoubtedly an equitable action"). However, the Supreme Court explained in *Knudson*, "not all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases in law, and in certain others in equity." 534 U.S. at 212. "Thus, restitution is a legal remedy when ordered in a case at law and an equitable remedy when ordered in an equity case, and whether it is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Id.* at 213 (internal quotation marks, alteration, ellipsis, and citation omitted).

> In cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at law through an action derived from the common-law writ of assumpsit. 1 [D.] Dobbs[, Law of Remedies (hereafter Dobbs)] § 4.2(1) [2d ed. 1993], at 571. See also *Muir*, [*ERISA Remedies: Chimera or Congressional Compromise?*, 81 Iowa L. Rev. 1, 37 (1995)]. In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." Restatement of Restitution § 160, Comment a, pp. 641–642 (1936). Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

> In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. See 1 Dobbs § 4.3(1), at 587–588; Restatement of Restitution, *supra*, § 160, Comment a, at 641–642; 1 G. Palmer, Law of Restitution § 1.4, p. 17; § 3.7, p. 262 (1978). A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Restatement of Restitution, *supra*, § 215, Comment a, at 867. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

*Id.* at 213–14. The Court in *Knudson* noted that the particular funds sought in the case before it were not in the possession of the parties from whom they were sought, but had been placed in a trust created under California law. *Id.* at 214. That is, "Great-West did not seek to recover a particular fund from the defendant." *Sereboff*, 547 U.S. at 363. Applying its rule, the Court

AO 72
(Rev. 8/82)

concluded "[t]he kind of restitution that petitioners seek, therefore, is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred upon respondents." *Knudson*, 234 U.S. at 214. As such, the Court held, § 1132(a)(3) did not authorize the action. *Id.* at 221.

19.         In *Sereboff v. Mid Atlantic Medical Services, Inc.*, the Supreme Court held that where a fiduciary seeks to impose a lien on a beneficiary pursuant to an agreement (e.g., the terms of a policy), and the funds or property sought is specifically identifiable and within the possession and control of the beneficiary, the relief sought is "equitable relief" for purposes of § 1132(a)(3). 547 U.S. at 362–63. The Court distinguished equitable liens "by agreement" from equitable liens "sought as a matter of restitution," *id.* at 364–65, and concluded that in claims for equitable liens by agreement, "strict tracing rules" that would require the party seeking recovery to trace the claimed money or property to particular funds or assets in the other party's possession do not apply. *Id.* at 365. Instead, an agreement imposing an equitable lien must "specifically identify a particular fund—distinct from the defendant's general assets—and a particular share of that fund to which the plan was entitled." *Gilchrest v. Unum Life Ins. Co. of Am.*, 255 Fed. Appx. 38, 45 (6th Cir. 2007) (citing *Sereboff*, 547 U.S. at 364). Since *Sereboff*, courts including the Eleventh and Sixth Circuits have considered claims brought by plan fiduciaries seeking to recover funds paid to beneficiaries under § 1132(a)(3). *See Popowski v. Parrott*, 461 F.3d 1367 (11th Cir. 2006); *Gilchrest*, 255 Fed. Appx. 38 (6th Cir. 2007). In *Gilchrest*, Unum counterclaimed to recover an overpayment it made to Gilchrest. The plan at issue stated that disability benefits "'may be reduced by deductible sources of income,' including the amount the employee recieves or is entitled to receive in Social Security disability benefits." 255 Fed. Appx. at 45. Addressing overpayments, the Plan stated as follows:

> Unum has the right to recover any overpayments due to:
> - fraud;
> - any error Unum makes in processing a claim; and
> - your receipt of deductible sources of income.

AO 72
(Rev. 8/82)

> You must reimburse us in full. We will determine the method by which the repayment is to be made.
> Unum will not recover more money than the amount we paid you.

*Id.* The Sixth Circuit found that Unum's claim to recover its overpayment satisfied *Sereboff* to constitute "equitable relief" under § 1132(a)(3) because "the Plan's overpayment provision asserts a right to recover from a specific fund distinct from Gilchrest's general assets—the fund being the overpayments themselves—and a particular share of that fund to which the plan was entitled—all overpayments due to the receipt of Social Security benefits, but not to exceed the amount of benefits paid." *Id.* at 45–46 (citing *Dillard's Inc. v. Liberty Life Assur. Co. of Am.*, 456 F.3d 894, 901 (8th Cir. 2006)).

20.        Here, Unum alleges it is entitled to recover its overpayment pursuant to certain provisions in the LTD policy. In its Counterclaim, Unum cites *Sereboff* and alleges that the LTD policy "contains a 'Reimbursement' provision by which Fier promised to repay Unum any overpayment caused by an award received for disability benefits through the United States Social Security Act or any other similar plan or act through which Fier is eligible to receive disability benefits." (Dkt. #15, Answer and Countercl. 9 ¶ 8.) Unum also alleges that Fier refused to reimburse it for the amount which has been overpaid, "pursuant to the terms of the Policy[.]" (*Id.* 9 ¶ 10.) In its answering trial brief, Unum alleges that it seeks reimbursement, "pursuant to the terms of the Plan, from specifically identifiable funds in Fier's possession." (Answering Trial Br. 20.) Accordingly, Unum points to the following provision of the LTD policy:

> [E]. MISSTATEMENT OF FACTS
> If relevant facts about any employee were not accurate:
> 1. a fair adjustment of premium will be made; and
> 2. the true facts will decide if and in what amount insurance is valid under this policy.

(*Id.* (quoting AR UACL00325.)) The LTD policy indeed includes a provision in which "the insured promises to repay [Unum] any overpayment caused by an award received" from Social Security disability payments as a result of the same disability for which he received payments under the LTD policy. (AR UACL00318.) The LTD policy contains another provision stating:

1
2
3

      2. Clerical error or omission will not:
      a. deprive an employee of insurance;
      b. affect an employee's amount of insurance; or
      c. effect or continue an employee's insurance which otherwise would not be in
        force.

4

(AR UACL00324–25.)

5     21.       Unum also alleges its overpayment to Fier was due to Fier's delay in prosecuting

6  and resolving his case. Unum claims Fier was "obligated to provide proof of his monthly earnings

7  to Unum on a quarterly basis, so that benefits payments could be adjusted in accordance with the

8  proof of earnings." (*Id.* 21 n.16.) Unum alleges Fier's "demonstrated pattern of delay in this case

9  ... prejudiced Unum's ability to obtain necessary financial records from him in a timely manner, to

10  administer his claim for benefits under both the LTD and the AD&D plan, and to bring this case to

11  a timely administrative conclusion. It also allowed him to continue to receive benefits for many

12  years after his 'current earnings' exceeded the plan's eligibility limitations." (*Id.* 21.)

13    22.       Unum's Counterclaim does not constitute an action to obtain "equitable relief"

14  under § 1132(a)(3), whether considered as seeking an equitable lien based on an agreement or

15  under a theory of restitution. First, to recover an overpayment by asserting an equitable lien by

16  agreement, Unum must show an *agreement* in which Fier promised to reimburse Unum for the

17  overpayment at issue here. *See Sereboff*, 547 U.S. at 359 (plan language requiring injured

18  beneficiary who recovers from third party to reimburse insurer for benefits paid due to the injury);

19  *Gilchrest*, 255 Fed. Appx. at 45 (overpayment provision quoted *supra*); *Popowski*, 461 F.3d at

20  1373. The only overpayment or reimbursement provision in the LTD policy at issue here relates to

21  reimbursement for Social Security disability benefits paid as a result of Fier's injury. Although

22  Unum's Counterclaim itself referenced that provision, neither its answering trial brief nor its sur-

23  reply trial brief does. To the extent Unum seeks reimbursement pursuant to the Social Security

24  benefits provision of the LTD policy, it has failed to provide evidence describing or quantifying

25  such payments and proving its entitlement to reimbursement for them. The LTD policy contains no

26  other reimbursement provision. The "Misstatement of Facts" and "Clerical error or omission"

provisions of the policy set forth above acknowledge such problems, but do not actually require the insured to reimburse Unum in the event either problem actually arises. And they similarly fail to "specifically identify a particular fund—distinct from the [beneficiary's] general assets—and a particular share of that fund to which the plan [is] entitled." *Gilchrest*, 255 Fed. Appx. at 45 (citing *Sereboff*, 547 U.S. at 364).

23.        Second, if Unum's Counterclaim instead seeks to impose an equitable lien under a theory of restitution, the Counterclaim fails because Unum does not present any evidence of the "specifically identifiable funds in Fier's possession" it seeks. Instead, it alleges only that due to Fier's "pattern of delay," it overpaid him a specific sum—$140,402.33—and submits spreadsheets setting forth the computations of its CPA leading it to that conclusion. Unum fails to identify particular property in Fier's possession as an equitable restitution claim requires, but instead seeks only to hold Fier personally liable for its overpayment, falling squarely under the rubric of *legal* restitution. Section 1132(a) does not authorize "the essentially legal relief" Unum seeks. *Knudson*, 534 U.S. at 220; *see also Chilko v. Lorren*, 2008 WL 3154734 (E.D. Cal. 2008) (unpublished order) ("it appears a claim for equitable relief pursuant to § 502(a)(3)(B) must seek specifically identifiable property that is within control or possession of the defendant").

24.        If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

## CONCLUSION

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that (1) Fier was not entitled to disability benefits under the LTD policy prior to 1997; (2) Fier was entitled to benefits under the LTD policy during a period, beginning in 1997 and ending in 1998, in which his current monthly earnings were less than 80% of his pre-disability earnings; (3) Unum overpaid Fier; (4) Fier is no longer insured under the LTD policy, and therefore is not presently and in the future will not be entitled to further benefits under the policy; (5) Unum therefore  has no present or future

AO 72
(Rev. 8/82)

1  obligation to Fier under the policy; (6) Fier is not entitled to any insurance benefits under the

2  AD&D policy; and (7) Unum is not entitled to reimbursement of any of its overpayment to Fier.

3          IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that the

4  Court finds for Defendant and against Plaintiff as to Plaintiff's Complaint. In addition, the Court

5  finds for Plaintiff and against Defendant as to Defendant's Counterclaim. Judgment is therefore

6  entered against both Plaintiff and Defendant, and the Court orders that Plaintiff take nothing by

7  way of his Complaint and that Defendant take nothing by way of its Counterclaim.

8          Dated: November 3, 2009.

9

10                                      _____

11                              ROGER L. HUNT
                            **Chief United States District Judge**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26